IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RANDY SALGADO,

      Petitioner,

v.                                        No. 20-cv-00899 JCH/JFR

RICK MARTINEZ, Warden of the
Otero County Prison Facility, and
HECTOR H. BALDERAS, Attorney
General for the State of New Mexico,

      Respondents.

## <u>MAGISTRATE JUDGE'S PROPOSED FINDINGS<br>AND RECOMMENDED DISPOSITION[1]</u>

**THIS MATTER** comes before the Court on Petitioner Randy Salgado's *Petition Under*

*28 U.S.C. § 2254 For Writ of Habeas Corpus By a Person In State Custody*.  Doc. 1.

Respondents filed an Answer, and Petitioner filed his reply.  Docs. 12, 21.  Having carefully

reviewed the record,[2] the parties' submissions and the relevant law, and for the reasons set forth

herein, the Court finds that the Petition is not well-taken.  The Court therefore recommends that

the Petition be **DENIED WITH PREJUDICE** and recommends against issuing a Certificate of

Appealability.

---

[1] The presiding judge referred this matter to the undersigned by Order of Reference "to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case."  *See* Doc. 7.

[2] The record in the action consists of the Petition (Doc. 1) and supporting documents (Docs. 1-1 through 1-25). Respondents have submitted their Response (Doc. 12) with supporting documents (Docs. 12-1 through 12-4, and 13-1).  The Court notes that within the Response's numerous attachments are individual Exhibits (i.e. Exhibits A-ZZZZ, and Docket Sheets 1 through 4).  *See* Doc. 12 at 9-14.  Thus, documents can be cited either to the ECF Document (e.g. Doc. 12-1, 12-2, etc.), or to the document's specific Exhibit letter and page number.  For example, the Order (appointing state habeas counsel) can be cited as "Doc. 12-3 at 311", or alternatively as "Exh. KKK at 1532".  While Respondents have elected the latter method, the Court has opted for the former, and its citations to the record will be to the document and page number as reflected in the Court's ECF docket.

## FACTUAL BACKGROUND

A grand jury indicted Petitioner of having committed various crimes including criminal sexual penetration of a minor, criminal sexual contact of a minor, and bribery of a witness.[3]  The minor victims, R.S. and T.R., are the daughters of Christine Trebizo with whom Petitioner was intimately involved and with whom he briefly resided.  During the time period set forth in the indictment, the girls were 6 and 9 years old respectively.  It was alleged that Petitioner caused R.S. to engage in fellatio; that he touched the vaginas of both R.S. and T.R.; caused T.R. to touch his penis; and threatened T.R. to prevent her from reporting these events.  Doc. 12-1 at 1-4. (Grand Jury Indictment).  The parties stipulated prior to trial that the conduct forming the basis of the indictment occurred between March 1, 2000 and September 30, 2000.  *See* Doc. 12-1 at 5-6 (Stipulated Order to Amend Date of Criminal Offense).

The case proceeded to jury trial in the Second Judicial District Court.  At the time of trial, R.S. was nine years old and T.R. was 13 years old.  In the presence of the jury, R.S. was unable to identify the Petitioner, Doc. 1-12 at 11, despite having testified that the reason she was in court was "[f]or Randy" who "used to live with [her] mom."  Doc. 1-12 at 6.  R.S. stated that, when she was asleep in the living room, Petitioner "put his privates in [her] mouth."  Doc. 1-12 at 10.  R.S. acknowledged under cross-examination that she previously described "Randy" as "tall" and "skinny", and that "Randy" had various tattoos on the back of his shoulder (possibly her mother's name) and elbow (a rose).  Doc. 1-12 at 14-16.

T.R. testified that she lived most of her life with her grandfather, but at some point she lived with her mother.  It was during her time with her mother that T.R. testified that Petitioner

---

[3] The Grand Jury charged Petitioner as follows:  Count 1, Criminal Sexual Penetration in the First Degree; Counts 2-5, Criminal Sexual Contact of a Minor in the Third Degree; Count 6, Bribery of a Witness.  *See* Doc. 12-1 at 1-3 ("Grand Jury Indictment").

"hurt" her by "touching where [she] wasn't supposed to be touched."  Doc. 1-15 at 6-7.  T.R.

testified that one day Petitioner had both T.R. and R.S. take off their clothes and proceeded to

touch both girls "in the privates".  Doc. 1-15 at 8.  T.R. also testified that he forced the girls to

touch him "in his private… up and down."  Doc. 1-15 at 10.  T.R. explained that she told her

mother of these events, but her mother didn't believe her.  Doc. 1-15 at 14.  T.R. also denied that

her father, who was in jail at the time when she had contact with Petitioner, had told her what to

say.  Doc. 1-15 at 18-19.  T.R. identified Petitioner in court in front of the jury.  Doc. 1-15 at 19.

Petitioner testified that he was not living with Ms. Trebizo at the time alleged in the

indictment.  Petitioner testified that he was living with another woman in the Summer of 2000,

and was working as a bus driver for the City of Albuquerque until November 2000.  Doc. 1-16 at

1-2.  Petitioner testified that he began working as a bail bondsman "around December", but

didn't get licensed until March 2021.  Doc. 1-16 at 1-2.  Petitioner testified he had never met

R.S. and only met T.R. once.  Doc. 1-16 at 14-15.  Petitioner stood before the jury and described

himself as 5'5" tall, approximately 200 pounds, and without the tattoos that R.S. described.  Doc.

1-16 at 6-7.  Photos of Petitioner's back, front and hands were introduced into evidence to

demonstrate the inaccuracy of R.S.'s description.  Doc. 1-16 at 6.

Other testimony focused on whether Petitioner had access to the children during the

charging period.  The defense introduced the testimony of Tammy Borunda, a friend of the

victims' mother, who testified that she remembered the date where Ms. Trebizo first met

Petitioner as March 9, 2001, because her cousin's wedding was the very next day.  Doc. 1-19 at

3-4.  The victims' mother, Christina Trebizo, did not testify despite a material witness warrant,

but the defense attorney successfully introduced into evidence an unsworn statement by Ms.

Trebizo at a conditions of release hearing, in which she stated that Petitioner never abused her

daughters, that Petitioner never had access to them, and that the victims' allegations were fabricated. Doc. 1-20 at 2-3. The state introduced the testimony of the victims' grandfather who testified that he saw Petitioner at Ms. Trebizo's house in the Fall of 2000, but denied that he saw Petitioner when he dropped the girls off at their mother's house to spend Easter weekend in the Spring of 2001. Doc. 1-18 at 1-2. Additionally, day-care records showed that R.S. and T.R. were in their mother's custody in the late Summer of 2000, until September 22, 2000 for R.S. and September 27, 2000 for T.R., when they were removed by State authorities and placed in the custody of separate guardians. Doc. 12-1 at 5-6.

The jury returned guilty verdicts to Counts 1, 2, 3, 5 and 6. *See* Doc. 12-1, 65-69.[4]

## **PROCEDURAL HISTORY**

Petitioner is currently an inmate detained by the State of New Mexico Department of Corrections. The trial court imposed a sentence of 25 years of imprisonment followed by five years of supervised probation. *Id.* at 118. Petitioner appealed the conviction and sentence to the New Mexico Court of Appeals, which affirmed on its summary calendar. *Id.* at 148-53; 157. After the Court of Appeals denied a motion for rehearing, *id.* at 190, Petitioner filed a petition for writ of certiorari in the New Mexico Supreme Court. The Supreme Court denied that petition on January 26, 2007. *Id.* at 224.

On March 21, 2008, Petitioner then filed a petition for a writ of habeas corpus in the state district court, asserting his factual innocence and ineffective assistance of counsel. Doc. 12-1 at 249-270. With no response filed by the state and after submitting numerous requests for hearing on the petition, Petitioner through counsel filed an amended petition in the district court on April

---

[4] The undersigned notes that Ct. 4 was dismissed by the trial judge by directed verdict. While there is no transcript in the record that shows this dismissal, it is clear that the charges submitted to the jury did not include Ct. 4. *See* Doc. 12-1 at 106 (Final Disposition); Doc. 12-1 at 399 ("Record of Trial"); *see also* Doc. 12-1 at 495 (noting that "[t]he trial court granted a directed verdict as to one count of CSC.").

25, 2012.  *Id.* at 313-379.  The state responded, Doc. 12-1 at 380-588, and the district court

eventually held an evidentiary hearing on the amended petition, on October 31 and November 6,

2019.  *See* Doc. 13 (Notice and Lodging of 8 CDs and audio log notes from Evidentiary Hearing

in state case D-202-CR-2014-16).  The district court denied the amended petition on April 28,

2020.  Doc. 12-3 at 768-790.  Petitioner then filed his "habeas corpus petition for writ of

certiorari" in the New Mexico Supreme Court, *id.* at 791-792; Doc. 12-4 at 1-10, which was

denied on July 29, 2020.  Doc. 12-4 at 326.

Petitioner filed the instant Petition in this Court on September 1, 2020, setting forth the

chronology of his case and the timeliness of the Petition.  Doc. 1 at 14 ("Timeliness of

Petition").[5]  Petitioner raises several grounds for granting the petition:

- Ground One:        Sufficiency of the Evidence
- Ground Two:        Ineffective Assistance of Counsel—Failure to Impeach
                     Witnesses with Prior Statements
- Ground Three:      Jury Composition/Violation of Right to Impartial Jury
- Ground Four:       Ineffective Assistance of Counsel—Failure to Investigate,
                     Failure to Present Expert Witness, Unreasonable Trial
                     Performance

In Ground One, Petitioner generally alleges that the State "fail[ed] to produce

documentation or elicit testimony from which a reasonable juror would be able to infer that the

alleged abuse occurred within the charging period."  Doc. 1 at 47.  Petitioner alleges that R.S.

failed to identify Petitioner as the individual who committed the abuse.  *Id.*  Petitioner

emphasizes that he had no relationship with the victims' mother during the charging period, and

---

[5] The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amends 28 U.S.C. § 2244 by imposing a 1-year period of limitation upon the filing of a petition seeking a writ of habeas corpus by a person in custody pursuant to a state court judgment.  28 U.S.C. § 2244(d)(1).  Respondent raises no objection to the timeliness of the instant Petition, and the Court's independent review does not indicate a lack of timely filing, *see* 28 U.S.C. § 2244(d), and therefore the Court will treat the Petition as timely filed under the AEDPA.

that the prosecution did not submit a timeline in support of its claims.  Doc. 21 at 7-8.

Additionally, though not listed as a separate ground, within Ground One Petitioner suggests a

violation of the Sixth Amendment's confrontation clause, by claiming that victim R.S. never

testified to any abusive conduct by Petitioner, which was instead testified to by her older sister

T.S.  Doc. 1 at 67-68; Doc. 21 at 1-4.

      In Ground Two, Petitioner argues that his trial counsel was ineffective by failing to

impeach the victim R.S. with her safehouse statement.  Doc. 1 at 73, 76.[6]  Petitioner asserts that

counsel's reason for not introducing the safehouse interview—due to the risk that the entire

statement would then be introduced—was unreasonable given that a reasonably competent

attorney would have sought a pretrial ruling on this issue.  Doc. 21 at 15-16.  Petitioner argues

counsel was ineffective for not obtaining and introducing into evidence Petitioner's employment

records which Petitioner asserts would have demonstrated the falsity of the prosecution's case.

*Id.* at 16-18.  Additionally, Petitioner claims ineffective assistance based on his lawyer's failure

to produce the victims' mother as a witness at trial, rather than introducing her unsworn pretrial

statement; Petitioner claims this testimony would have more effectively corroborated the

testimony of other witnesses at trial that Petitioner could not have met the girls during the

charging period.  *Id.* at 20.  Additionally, Petitioner argues that counsel's failure to produce the

victims' mother to testify was prejudicial, given that counsel had told the jury to expect her

testimony.  *Id.* at 21-23.

---

[6] Petitioner also suggests that counsel was ineffective for not impeaching T.R. with her safehouse statement, but because he "lost" T.R.'s statement "somewhere over the years", and given the statute of limitations under 28 U.S.C. § 2244, Petitioner is unable to further this argument.  Doc. 1 at 81.  Petitioner advances no argument regarding trial counsel's alleged ineffective assistance as to his examination of T.R., and as such, the Court will consider Petitioner's argument as limited to trial counsel's alleged ineffectiveness for not impeaching R.S. with her safehouse interview; any claim as to T.R. on this basis is waived.

In Ground Three, Petitioner claims his counsel was again deficient by allowing A.H. to be seated as a juror, when A.H. disclosed during voir dire that she had been sexually abused as a six-year old.  Petitioner asserts that trial counsel mistakenly attributed A.H.'s statements during voir dire to another person in the venire, which other individual was excused by the trial judge. Doc. 21 at 27.  Petitioner argues A.H.'s bias is implied under the circumstances, given the nature of A.H.'s personal experience and the charges in the case, resulting in a violation of his constitutional rights.  Doc. 1 at 82, 100; Doc. 21 at 30-31.

In Ground Four, Petitioner raises additional ineffective assistance claims, arguing he suffered prejudice when his trial counsel: (1) failed to investigate an individual who has tattoos similar to those R.S. described to be on the perpetrator; (2) failed to present an alibi witness at trial; (3) failed to present expert witnesses; and (4) failed to secure the testimony of the mother of the victims.  Doc. 1 at 105-110.

## **LEGAL STANDARDS**

The Antiterrorism and Effective Death Penalty Act of 1996:  The statutes governing federal habeas corpus actions for state and federal prisoners were substantially amended by the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective April 24, 1996.  Pub. L. No. 104–132, 110 Stat. 1214.  Petitioner is a New Mexico prisoner seeking federal habeas relief, so his habeas petition is governed by the AEDPA's amendments. *See Lindh v. Murphy,* 521 U.S. 320, 336 (1997) (AEDPA's amendments apply to habeas petitions filed after the AEDPA's effective date of April 24, 1996); *see also* Doc. 12 at 8 (conceding that Petitioner "was in custody at the time he filed the petition, and remains in the lawful custody of the New Mexico Department of Corrections as of the date of the filing of this answer").  Federal courts are to presume that the factual findings of the state court are correct,

and petitioner bears the burden of rebutting this presumption by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Under the AEDPA, federal habeas corpus relief is proper only when the state court's adjudication of a federal claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In ascertaining whether the law is clearly established, the Court reviews Supreme Court holdings extant when the state court conviction became final.  *House v. Hatch,* 527 F.3d 1010, 1015 (10th Cir. 2008) (quoting *Williams v. Taylor (Terry Williams),* 529 U.S. 362, 380 (2000)).

Mixed Petitions and the AEDPA's Exhaustion Requirement:  § 2254 requires a petitioner to exhaust all available state remedies.  *See Magar v. Parker*, 490 F.3d 816, 818-19 (10th Cir. 2007); *Montez v. McKinna*, 208 F.3d 862, 866 (10th Cir. 2000) (citing *Coleman v. Thompson*, 501 U.S. 722, 731 (1991)).  To satisfy exhaustion, the § 2254 applicant must present the factual and legal bases of a claim at both the administrative and state court levels.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-45 (1999); *Hamm v. Saffle*, 300 F.3d 1213, 1216 (10th Cir. 2002) (citations omitted).  Furthermore, exhaustion must be total, meaning that each claim raised in a habeas petition must be exhausted.  *Rose v. Lundy*, 455 U.S. 509 (1982).  The total exhaustion requirement has been amended, however, to allow a court to reach the merits of a mixed petition when it is clear that each claim must be denied.  28 U.S.C. § 2254(b)(2); *Fairchild v. Workman*, 579 F.3d 1134, 1156 (10th Cir. 2009) (when faced with a mixed petition, a district court could dismiss the petition in its entirety, stay and abate the petition while petitioner exhausts his claims

in state court, allow petitioner to dismiss the unexhausted claims and proceed only with the

exhausted claims, or ignore the exhaustion requirement and deny the petition for lack of merit);

*see also Williams v. Jones*, 571 F.3d 1086, 1089 (10th Cir. 2009) ("Of course, a habeas petition

may be denied despite a failure to exhaust. […] But it may not be granted unless exhaustion has

occurred (or an exception to exhaustion applies) (citations omitted).

    <u>Sufficiency of the Evidence</u>:  Evidence is sufficient to support a conviction so long as

"after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*

*v. Virginia*, 443 U.S. 307, 319 (1979).  "[W]hile the evidence supporting the conviction must be

'substantial' and 'do more than raise a mere suspicion of guilt,' it 'need not conclusively exclude

every other reasonable hypothesis and it need not negate all possibilities except guilt.'" *United*

*States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (citing *United States v. Troutman*, 814

F.2d 1428, 1455 (10th Cir. 1987) and *United States v. Alonso*, 790 F.2d 1489, 1493 (10th Cir.

1986)).  A court will not "overturn a jury's finding unless no reasonable juror could have reached

the disputed verdict." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997).  Nor will a

federal court overturn a state court decision regarding sufficiency of the evidence unless the state

court's decision was "objectively unreasonable". *Cavazos v. Smith*, 565 U.S. 1, 4 (2011)

(citation omitted).  Rather, a court must "affirm the judgment of conviction if there is record

evidence which would allow a rational trier of fact to find the defendant guilty of the crime

charged in the indictment beyond a reasonable doubt." *United States v. Young*, 862 F.2d 815,

818 (10th Cir. 1988).  Finally, the state court decision will meet the AEDPA standard 'unless the

analysis [is] so flawed as to undermine confidence that the constitutional claim has been fairly

adjudicated." *Mora v. Williams*, 111 Fed.Appx 537, 541 (10th Cir. 2004) (Unpubl.) (citing *Cruz v. Miller*, 255 F.3d 77, 87 (10th Cir. 2001).

    <u>Ineffective Assistance of Counsel</u>:  The Sixth Amendment of the U.S. Constitution guarantees the right to effective assistance of counsel at trial.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  For Petitioner to succeed on his claims of ineffective assistance under § 2254, he must demonstrate both that (1) "counsel′s representation fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense."  *Id.* at 687-88.  For counsel's performance to fall outside the bounds of professional reasonableness, Petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  To show prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel′s unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  A court "may address the performance and prejudice components in any order, but need not address both if [the defendant] fails to make a sufficient showing of one."  *Boltz v. Mullin*, 415 F.3d 1215, 1222 (10th Cir. 2005) (citing *Cooks v. Ward*, 165 F.3d 1283, 1292–93 (10th Cir. 1998)).

    The appropriate standard for attorney performance is that of reasonably effective assistance; the defendant must demonstrate that counsel's representation, considering all the circumstances, fell below an objective standard of reasonableness based on prevailing professional norms.  *See Strickland*, 466 U.S. at 687–88.  For counsel's performance to be constitutionally ineffective, it must have been "completely unreasonable, not merely wrong."  *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) (quoting *Hatch v. Oklahoma*, 58 F.3d

1447, 1459 (10th Cir. 1995)).  When evaluating an attorney's performance, the Court must be

highly deferential:

> A fair assessment of attorney performance requires that every effort be
> made to eliminate the distorting effects of hindsight, to reconstruct the
> circumstances of counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time.  Because of the difficulties
> inherent in making the evaluation, a court must indulge a strong
> presumption that counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the defendant must overcome
> the presumption that, under the circumstances, the challenged action might
> be considered sound trial strategy.

*Strickland*, 466 U.S. at 689 (internal quotation marks omitted).

In applying this test, the Court must give considerable deference to an attorney's strategic

decisions and "recognize that counsel is strongly presumed to have rendered adequate assistance

and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* at

690.  "Neither hindsight nor success is the measure" of whether counsel was effective, and

"effective" is not synonymous with victorious or flawless.  *Dever v. Kansas State Penitentiary*,

36 F. 3d 1531, 1537 (10th Cir. 1994).  Rather, to be considered *ineffective* assistance of counsel,

"the representation must have been such as to make the trial a mockery, sham, or farce, or

resulted in the deprivation of constitutional rights."  *Id.* (*citing Lorraine v. United States*, 444

F.2d 1, 2 (10th Cir. 1971)).

Section 2254(d) adds a second layer of deference.  When a federal habeas court reviews a

state court's decision on a *Strickland* claim, the habeas court must grant the state court "a

deference and latitude that are not in operation when the case involves review under the

*Strickland* standard itself."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The only question

for the habeas court is whether the state court had a reasonable basis for rejecting the *Strickland*

claim.  *Id.* at 105.  "The *Strickland* standard is a general one, so the range of reasonable applications is substantial."  *Id*.

## ANALYSIS

After reviewing the motion and response, as well as the underlying files and records of the case, I can hold an evidentiary hearing.  28 U.S.C. § 2254(d); *Townsend v. Sam*, 372 U.S. 293, 312 (1963).  To warrant such a hearing, the Petitioner must show that the hearing held in state court was not fair or adequate.  Rules Governing Section 2254 Cases Rule 8, Adv. Comm. Notes; § 2254(d).  When reviewing the record in this case, including Petitioner's Motion and United States' response as well as all the documents in the underlying criminal case, I am mindful that I must liberally construe a pro se litigant's pleadings and hold them to a less stringent standard than pleadings drafted by an attorney.  *Hall v. Bellman*, 935 (10th Cir. 1991) (citations omitted).  I have done so here and have determined that no such evidentiary hearing is warranted, as the petition, files and records in this matter conclusively show that Petitioner received a fair and adequate hearing.  I am comfortable ruling without taking additional testimony or evidence.

1.  Whether the Court Should Address Unexhausted Claims

Respondents submit that Petitioner failed to exhaust two of his claims: (1) the confrontation clause issue (within Ground One) where T.R. provided relevant testimony at trial as to the criminal sexual contact charge that named R.S. as the victim; and (2) and (in Ground Three) trial counsel's failure to prevent A.H. from being seated as a juror.  Respondents point out that these issues were not argued in the state courts on direct appeal or post-conviction proceedings.  Doc. 12 at 15-17.  Notwithstanding Petitioner's alleged failure to exhaust,

Respondents state that it is appropriate for the Court to address these unexhausted issues, rather than dismissing them without prejudice, because it is clear that each claim must be denied.  *Id.*

Petitioner claims that he exhausted his claims in the state courts, although Petitioner admits that his "presentation of these two issues… [was] not articulated with the exact language found in the state proceedings."  Doc. 21 at 3.  Petitioner generally claims that the issues were presented to the New Mexico Court of Appeals under "sufficiency of the evidence" and "jury composition".  *Id.*  Despite Respondents' "narrowed critique", Petitioner requests that the claims be considered in this Court.  *Id.*

The Court's review of the record in this case demonstrates that Petitioner failed to argue the issues in State court, either on direct appeal or in post-conviction proceedings.  *See* Doc. 12-1 at 161 ("Memorandum in Opposition…"); Doc. 12-1 at 192 ("Petition for Writ of Certiorari…")' Doc. 12-3 at 1534 ("Amended Petition for Writ of Habeas Corpus").  Regarding the matter of trial counsel's failure to strike juror A.H., the Court notes that on direct appeal Petitioner argued in the New Mexico Court of Appeals that "the make-up of the jury members violated his constitutional right to an impartial jury."  Doc. 12-1 at 184.  Nonetheless, the Court of Appeals refused to consider the issue as it was not raised in the Docketing Statement.  *Id.*  Nor did Petitioner raise the matter in State post-conviction proceedings.  *See* Doc. 12-3 at 1534.  Accordingly, the Court agrees with Respondents that these issues are unexhausted.

The propriety of addressing these unexhausted issues is thus before the Court.  The principle that would suggest the case should be stayed and abated while Petitioner returns to state court to exhaust his claims is comity: "it is a principle controlling all habeas corpus petitions to the federal courts, that those courts will interfere with the administration of justice in the state courts only 'in rare cases where exceptional circumstances of peculiar urgency are shown to

exist.'" *Granberry v. Greer*, 481 U.S. 129, 134 (1987) (citing *Ex parte Hawk,* 321 U.S. 114, 117 (1944)).  On the other hand, if it is "perfectly clear" that the unexhausted issue fails to raise a colorable federal claim, federal courts may deny the habeas petition in "the interests of the petitioner, the warden, the state attorney general, the state courts, and the federal courts…".  *Id.* at 135.  "[T]here is a strong presumption in favor of requiring the prisoner to pursue his available state remedies, [but] his failure to do so is not an absolute bar to appellate consideration of his claims." *Granberry*, 481 U.S. at 131.  Here, the Court concludes that it may address these two issues, rather than holding these proceedings in abeyance while Petitioner exhausts them in state court, as the Court is convinced that neither issue raises a colorable federal claim and addressing them now serves the interests of the individuals and entities affected.  *See Hoxsie v. Kerby*, 108 F.3d 1239, 1242-43 (10th Cir. 1997).

a.   Whether Petitioner's Right to Confrontation Was Violated

Subsumed within his sufficiency of the evidence argument (Ground One), Petitioner states that victim R.S. failed to specifically testify that Petitioner committed any act that might constitute criminal sexual contact of a minor as charged in count 2 of the indictment.  *See* Doc. 12-1 at 1.  Petitioner notes that "[n]owhere does she testify that 'Randy' touched or applied force to her vagina." *See* Doc. 1 at 67.  Rather, T.R. provided the crucial testimony, testifying that Petitioner touched or applied force to both her and R.S.'s vaginas.  *Id.*  "Petitioner contends that a conviction based solely upon a third party's testimony is too tenuous to meet the State's burden of proof." *Id.* at 68.  Petitioner argues "that this practice also violates his constitutional rights to confront the complaining witness." *Id.*

Beyond this reference to the Sixth Amendment's Confrontation Clause, Petitioner does not develop the argument.  Construing Petitioner's argument liberally, *see Drake,* 927 F.2d at

1159, Petitioner argues that T.R.'s testimony somehow substituted for R.S.'s testimony. As Petitioner frames it, "[u]nder [State v.] *Ortiz-Burciaga*, R.S. would have to testify that the Petitioner did in fact unlawfully and intentionally touch or apply force to her vagina." Doc. 1 at 67 (citing *State v. Ortiz-Burciaga*, 1999-NMCA-146, ¶¶ 26-29, 128 N.M. 382, 993 P.2d 96). Petitioner contends that "a conviction based solely upon a third-party's testimony is too tenuous to meet the state's burden or proof." Doc. 1 at 68. The Court is not persuaded.

First, R.S. testified but was unable to explicitly identify Petitioner in court. *See* Doc. 12-2 at 297-314. But when asked why she was testifying, R.S. answered "For Randy". Doc. 12-2 at 301. R.S. stated that she knew Randy "[b]ecause he used to live with my mom", though she couldn't say when. *Id.* at 302. R.S. stated that Randy "made us take off our clothes, and he stuck his privates in my mouth." *Id.* at 304. R.S. was unable to provide any details about that incident, other than it occurred in the living room where she had been sleeping on the couch. *Id.* at 306. R.S. testified that she told her grandma of what happened, but did not see "Randy" in the courtroom. *Id.* at 307.

T.R. also testified at trial. Doc. 12-2 at 316-344. T.R. identified the Petitioner as "Randy" at trial, and stated that she was testifying at trial because "Randy" touched her where she wasn't supposed to be touched. *Id.* at 321. T.R. testified that Randy called T.R. and her younger sister into their mom's room and had them take their clothes off. *Id.* at 322. T.R. stated that Randy touched her "in the privates", and "then he got my sister… touching her in the same place." *Id.* at 322-23. T.R. also testified that Randy "grabbed me, my hand first, and then made me touch him in his private." *Id.* at 324. T.R. also testified that she saw Randy make her sister R.S. "touch[ ] his private the same way I did*." Id.* at 325. T.R. stated that Randy told not to tell anyone "or he might do it again." *Id.*

Thus, Petitioner's statement that his conviction for criminal sexual contact of a minor as charged in Count 2 was based "solely" on the testimony of a third-party, T.R., is overstated. At trial, both girls testified. T.R.'s statements reflect what T.R. personally did and observed, including what she observed Petitioner do to R.S. T.R.'s testimony doesn't appear to contain inadmissible hearsay,[7] nor did T.R.'s testimony somehow deprive Petitioner of his ability to confront the witnesses against him. Petitioner's counsel effectively cross-examined both R.S. and T.R., using inconsistencies between their recorded safehouse interviews, their pre-trial interviews, and their trial testimony. *See* Doc. 12-2 at 310-13 (noting inconsistencies in R.S.'s physical description of "Randy", including physical characteristics and tattoos); Doc. 12-2 at 334-41 (noting discrepancies in T.R.'s pretrial interview and her trial testimony regarding her description of "Randy's" clothing, who "Randy" touched first, and generally her inability to recall details of the residence and incident).

In all criminal prosecutions, the defendant has the right to confront his accusers. U.S. Const., 6th Amend. Here, Petitioner exercised that right. He confronted both R.S. and T.R., and while T.R.'s testimony included observations of what she saw Petitioner do to her sister, at no time did T.R. testify in the place of R.S. or otherwise introduce evidence that deprived Petitioner of his right to confront R.S. It was up to the jury to determine if the State presented sufficient proof as to any crime committed against R.S. Petitioner cites to *State v. Ortiz-Burciaga* for the proposition that there must be *direct* testimony from R.S. herself that Petitioner unlawfully touched her vagina, before there can be a conviction of criminal sexual contact of a minor. Doc. 1 at 67-68 (citing *Ortiz-Burciaga*, 128 N.M. at 388-89). But *Ortiz-Burciaga* is not demanding. While it is true that the child victim in *Ortiz-Burciaga* directly stated that the defendant there

---

[7] *See e.g.* Fed. R. Evid. 801(c) ("hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

"put his private in my private", 128 N.M. at 389, the Court of Appeals didn't hold that a conviction is invalid without such direct testimony.  Besides, *Ortiz-Burciaga* focused on a sufficiency of the evidence claim, and not confrontation clause issues.  128 N.M. at 388-89. Here, Counsel cross-examined R.S., and exposed R.S.'s lack of detail; the jury weighed her statements in light of the charges of criminal sexual contact of a minor.  Given the record in this case, the Court sees no merit in Petitioner's claim that he suffered a violation of his Sixth Amendment right to confrontation.  The Court recommends the District Judge deny this unexhausted claim, as it very clearly lacks merit and will be denied if presented to the state courts.

b.  <u>Jury Composition and Failure to strike A.H. from the jury</u>

In Ground Three of his Petition, Petitioner argues that trial counsel was ineffective for failing to strike A.H. from the jury.  Doc. 1 at 82-104.  Petitioner argues that A.H.'s personal experience "should have alerted the court and defense counsel to a high level of certainty that she was incapable of being fair and impartial."  Doc. 1 at 97.  Based on A.H.'s statements about being abused when she was five years old, Petitioner states that defense counsel should have moved to strike her for cause, or at least used one of the remaining peremptory challenges.  *Id.* at 100.

Because the "jury composition" challenge (which included the claim that a seated juror may have been the victim of a sex crime) was not raised in the Docketing Statement, the New Mexico Court of Appeals presumed that the appellant (Petitioner) sought to amend.  *Id.*  The state appellate court refused to accept the argument that a potential juror "who may have been the victim of a sexual assault of some sort… should be barred from participating as a juror in a

trial involving wholly unrelated charges." Doc. 12-1 at 184.  The appellate court denied the

motion to amend and rejected the undeveloped assertion of error.  *Id.* at 184-85.

  In order to show counsel was ineffective for failing to object to the presence of certain

persons on the jury, a petitioner must prove "counsel's representation fell below an *objective*

standard of reasonableness."  *Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986) (emphasis

added).  A defense counsel's failure to attempt to remove from the jury a person who has been

established on voir dire to be biased constitutes prejudice under *Strickland.  See Johnson v.*

*Armontrout,* 961 F.2d 748, 755–56 (8th Cir. 1992).  To demonstrate a juror's bias, a defendant

must show that the juror had such a fixed opinion that he or she could not judge impartially.  *See*

*Patton v. Yount,* 467 U.S. 1025, 1035 (1984).  A juror is not shown to have been partial simply

because he or she had a preconceived notion as to the guilt or innocence of the accused. *See*

*Murphy v. Florida,* 421 U.S. 794, 800 (1975).  The Supreme Court stated in *Irvin v. Dowd,* 366

U.S. 717 (1961):

> It is not required ... that the jurors be totally ignorant of the facts and issues
> involved....  To hold that the mere existence of any preconceived notion as to the
> guilt or innocence of an accused, without more, is sufficient to rebut the
> presumption of a prospective juror's impartiality would be to establish an
> impossible standard.  It is sufficient if the juror can lay aside his impression or
> opinion and render a verdict based on the evidence presented in court.

*Id.* at 722–23.  Thus, a petitioner must show more than that the juror had a preconceived notion

of guilt; he must show that the juror had such a fixed opinion that he or she could not judge the

case impartially.  State court determinations as to the partiality of individual jurors are entitled to

a presumption of correctness under 28 U.S.C. § 2254(d), as they address questions of fact.

*Patton*, 467 U.S. at 1036-38 ("Rather it is plainly one of historical fact: did a juror swear that he

could set aside any opinion he might hold and decide the case on the evidence, and should the

juror's protestation of impartiality have been believed.").

During voir dire, after the attorneys questioned the panel, the Court and the attorneys privately heard from certain jurors about issues that they preferred not to discuss in public.  The first juror who spoke privately was A.H., who described an incident when she was five years old and was "abused" by a 12-year old boy.  A.H. stated that she was threatened, couldn't tell anyone, and that it wasn't a good experience.  Doc. 1-22 at 84.  A.H. stated that, during voir dire,

> while I'm sitting here, while you're asking about being bullied, I'm sitting here, and I couldn't think of anything, you know, and then I thought, Oh no.  And my heart is pounding.  My palms are sweating.  I mean, I was five and he was 12.  It wasn't innocent.  I didn't know what the heck he was up to.  And so from that point of view that's how I feel.

*Id*.  When asked by the attorneys if she could put her personal experience aside and be able to judge the facts of this case, A.H. responded "I think I could probably judge what the children said.  I can remember that as though it was yesterday, and so I think that—I think I could judge if they are telling the truth."  *Id.*  A.H. assured that she could be fair and impartial and noted she had been a juror three or four times.  *Id.*  The defense attorney didn't have any questions for A.H. *Id.* at 85.  Before leaving, A.H. volunteered that "[e]xcept, for ten years, if I had a gun I would have shot him.  That's all."  *Id.*  Neither attorney asked any follow-up questions of A.H. based on this comment.  Finally, the defense attorney did not move to strike A.H. for cause or use a peremptory strike, and agreed to seat A.H. as a juror.  *Id.* at 115.

Ultimately, the Court fails to see how the statements made by A.H. during voir dire, and the experience that she privately recounted to the trial judge and lawyers, result in implied bias, let alone make hers an "extreme" case that "leave[s] serious question whether the trial court… subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice." *Smith v. Phillips*, 455 U.S. 209, 222 (1982).  Moreover, A.H.'s statements vaguely refer to "abuse", but it remains unclear if the abuse was sexual in nature or something else.  Even if

A.H.'s experience could be shown to be similar to that of the victims here, "[r]ather than presume bias in any rape victim who is called as a prospective juror in a rape trial, we prefer an approach that focuses more closely on the particular juror's experience." *Gonzales v. Thomas*, 99 F.3d 978, 990 (10th Cir. 1996).  The lack of details behind A.H.'s experience, and A.H.'s assurance of impartiality, prevent the Court from inferring bias.[8]  Because it is clear that this claim will be unsuccessful if raised in the state courts, this Court recommends that the District Judge deny it.

       2.   <u>Ground One:  Whether There Was Sufficient Evidence To Support The Verdicts</u>

       Petitioner argues that this Court should reverse his convictions due to a lack of evidence to support the jury's guilty verdicts.  Specifically, Petitioner claims that "at no time during the trial did the state produce documentation or elicit testimony from which a reasonable juror could be able to infer that the alleged abuse occurred within the charging period."  Doc. 1 at 47. Petitioner also argues that R.S. was unable to identify the Defendant at trial as her assailant and there were no witnesses to the alleged abuse.  *Id.*  As such, Petitioner claims that his convictions must be vacated.

       In this case, prior to trial, the parties stipulated that the charging period for the indictment would be between March 1, 2000 and September 30, 2000.  Doc. 12-1 at 5-6 ("Stipulated Order to Amend Date of Criminal Offense").  Petitioner points to the fact that R.S. never testified that the abuse actually occurred during this period, and there were no witnesses to the alleged abuse. Doc. 1 at 47.  R.S. was also unable to articulate what part of Petitioner's body was involved in the abuse, other than calling it his "private".  *Id*. at 48-49.  Petitioner notes that T.R. testified that

---

[8] Petitioner claims that his counsel was "confused" as to comments made by A.H., and may have attributed her comments to another juror.  *See* Doc 1 at 101; Doc. 21 at 29.  However, this claim appears to have been undeveloped in the Court of Appeals, which made no reference to it.

she was nine years old at the time of the abuse, but during the charging period she was in

actuality only eight years old. *Id.* at 57.  T.R. testified that she first met "Randy" when he

worked as a bondsman, but Petitioner claims he didn't start that job until after the charging

period. *Id.* at 58-59.  Petitioner also claims that he did not meet the children's mother until after

the charging period, meaning that he could not have had access to the girls, a fact corroborated

by witness Burunda. *Id.* at 62-63.

Petitioner presented his sufficiency of the evidence argument to the New Mexico Court

of Appeals.  In its Memorandum Opinion, the Court of Appeals applied the correct standard of

review and viewed the evidence at trial in the light most favorable to the State, "resolving all

conflicts therein and indulging all possible inferences therefrom in favor of the verdict."  Doc.

12-1 at 177 (citing *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988)).  The

appellate court reviewed the evidence in light of the elements of the charges, and found that the

evidence was sufficient to sustain all of the convictions.  The court stated:

> We have acknowledged that Defendant denied the allegations of wrongdoing, that
> R.S. was unable to visually identify Defendant at the time of trial, and that
> evidence was introduced suggesting that Defendant did not have access to the
> children between March 1 and September 30, 2000.  As we indicated in the notice
> of proposed summary disposition, "the jury was not obligated to believe
> Defendant's testimony, to disbelieve or discount conflicting testimony, or to adopt
> Defendant's view.

Doc. 12-1 at 179-80 (citation omitted).  And later, the Court of Appeals continued:

> Finally, we reject Defendant's characterization of the verdicts as the product of
> conjecture…  "When a defendant argues that the evidence and inferences present
> two equally reasonable hypotheses, one consistent with guilt and another
> consistent with innocence, our answer is that by its verdict, the jury has
> necessarily found the hypothesis of guilt more reasonable than the hypothesis of
> innocence."  […]  This Court is not at liberty to second-guess the jury's decision
> concerning the credibility of witnesses, to reweigh the evidence, or to substitute
> our judgment for that of the jury.

Doc. 12-1 at 180 (internal citation omitted).

This Court is unable to conclude that the New Mexico Court of Appeals' decision was "objectively unreasonable." The jury assessed each witness' credibility and weighed their testimony in light of all the evidence. At trial and as discussed *supra*, R.S. and T.R. testified as to the abuse they experienced. While their testimony may have lacked details, the state presented other witnesses whose testimony tended to corroborate the girls' claims. For example, Joe Baca testified that he saw Petitioner at Ms. Trebizo's house in the Fall of 2000, thereby providing evidence that Petitioner had access to the girls during the charging period. Doc. 12 at 22. Records from daycare providers and schools also established that the girls were residing with Ms. Trebizo in the fall of 2000. *Id*. Additionally, while there was some dispute as to when Petitioner commenced work as a bondsman, Petitioner testified that he began work "around" December 2000, so the start date was uncertain and not necessarily in conflict with T.R.'s testimony.[9] Given Petitioner's imprecise testimony about when he worked as a bondsman, *see* Doc. 1-16 at 1-2, given that the girls were living with their mother into September 2000, and given that Joe Baca testified he saw Petitioner at Ms. Trebizo's house when he picked up his grand-daughter, it was not unreasonable for the jury to reject Petitioner's claim that he didn't meet Ms. Trebizo until 2001; rather, the jury was able to rationally conclude that his contact with Ms. Trebizo, and by extension his contact with the girls, had occurred in 2000, during the charging period.

The state appellate court affirmed the judgment of conviction as the record evidence clearly allowed the trier of fact to find Petitioner guilty of the crimes charged. There is no suggestion that the state jury performed its duty irrationally or unreasonably. Finally, this Court is unable to conclude that the state court decision is "so flawed as to undermine confidence that

---

[9] T.R. testified that she met Petitioner "because" he worked at a bonding company, but the Court doesn't read the testimony to suggest that she necessarily met him *when* he worked there. *See* Doc. 1-15 at 12.

the constitutional claim has been fairly adjudicated." *Mora*, 111 Fed.Appx at 541.  The undersigned recommends that the District Judge deny Petitioner's sufficiency of the evidence claim.

    3.  <u>Grounds Two and Four: Whether Counsel Provided Effective Assistance</u>

Petitioner claims that trial counsel was ineffective for (1) failing to impeach R.S. with her safehouse statement,[10] (2) failing to investigate another individual's tattoos and an alibi defense, (3) failing to present expert witnesses,[11] (4) failing to secure the testimony of the victims' mother, Christina Trebizo, and (5) cumulative prejudice. *See* Doc. 1 at 73-110.  Petitioner had previously raised these claims in his petition for habeas corpus that he filed in the state district court, *see* Amended Petition for a Writ of Habeas Corpus, Doc. 12-3 at 313-379, and which petition was argued before the state district judge in a two-day evidentiary hearing. *See* Doc. 13-1 (Logsheets and 8 Evidentiary Hearing CDs with Audio Log Notes, lodged by Respondents). After presiding over the hearing and considering the evidence presented, the state district judge denied Petitioner's Rule 5-802 Petition.  Doc. 12-3 at 768-790.

The Court will provide a brief review of the evidence presented at that hearing.[12]  The parties presented the testimony of six witnesses.  Petitioner presented Scott Elliot, who was qualified as an expert in general criminal investigations.  Doc. 13-1, 10/31/2019 CD 1 at 4:48 et seq.; 21:22.  Mr. Elliot discussed problems with the police investigation, and faulted the investigating detective for not utilizing a photo array, not conducting follow-up interviews,

---

[10] Petitioner states that he no longer has the transcript of T.R.'s safehouse interview and does not present any argument regarding trial counsel's ineffectiveness for failing to impeach.  As such, Petitioner has abandoned any claim that his trial counsel was ineffective on this ground.  *Craig v. McCollum*, 590 Fed.Appx. 723, 725-26 (10th Cir. 2014); *Lefevers v. Gibson*, 182 F.3d 705, 725 (10th Cir. 1999).

[11] Petitioner "concedes that the evidence in this case was not of such character that an expert was required…".  *See* Doc. 21 at 18-19.  Accordingly, the Court will not review this claim and considers it waived.

[12] The Court relies on the logsheets and CDs lodged by Respondents at Doc. 13-1.

making no attempts to find other witnesses, and not recording any telephonic interviews.  Elliot reviewed the Safehouse interviews of R.S. and T.R., noting that R.S. provided a physical description of the suspect, including several of his tattoos.  He also noted that an individual associated with the victims' family, Joe Baca, was later found to have tattoos consistent with those described by R.S., but law enforcement conducted no follow-up.  Elliot commented that the investigating detective did not establish a timeline which, had one been created, would have established that Petitioner could not have been in contact with the victims.  Elliot concluded that the detective did not do a thorough investigation per general criminal investigation standards.

Petitioner next presented the testimony of Barry Porter, an experienced criminal defense attorney who analyzed the representation provided by Petitioner's trial attorney.  10/31/2019 CD 2 at 10:00 et seq.  Porter testified as an expert witness in criminal trial litigation, defense and preparation.  He noted various aspects of the criminal investigation that should have been more fully attacked at trial.  These included a failure to understand why CYFD found the abuse and neglect allegations unsubstantiated, a failure to effectively use the children's medical and school records, a failure to highlight discrepancies between the victims' statements, the failure to secure the trial testimony of victims' mother Christine Trebizo, and trial counsel's failure to present expert witnesses on coaching and false memory issues.  He noted a lack of corroborating statements from witnesses, and discussed various motions that competent counsel would have filed.  Porter admitted that different lawyers have different styles, but his testimony spoke to minimum competency of criminal defense counsel.  Porter concluded that Petitioner did not have adequate counsel nor did he receive a fair trial.

Petitioner testified next.  10/31/2019 CD 3 at 13:58 et seq.  Petitioner claimed that his trial attorney did not obtain his work records, did not obtain CYFD records, and did not continue

the case, despite Petitioner having requested such when it was apparent that the victims' mother would not testify at trial.  He testified that trial counsel did not present evidence that would have supported his claim that the children's father pressured them into accusing Petitioner.  Petitioner also faulted trial counsel for not obtaining experts and for not introducing the victims' safehouse interviews as exhibits at trial, even after Petitioner requested this.

The State of New Mexico presented the testimony of Don Roberts, a detective with the Albuquerque Police Department, who testified as an expert in criminal child sexual abuse investigations.  10/31/2019 CD 3 at 30:44 et seq.  Roberts testified that he reviewed the safehouse interview transcripts and noted that the interviewer asked non-leading questions and, in his opinion, conducted the interviews appropriately.  Roberts explained that children are not able to realistically measure time like an adult, and noted that it wasn't unusual to not develop a clear timeline of events in these types of cases.  He acknowledged that R.S. described tattoos on the suspect that Petitioner lacked but stated that children might describe familiar marks or tattoos even if they are not on the perpetrator.  Roberts disagreed that a photo array was suitable under the circumstances of the case, and that discrepancies in the children's stories are to be expected. He admitted there were some problems in the investigation but concluded that the investigation was not botched.

When the case was recalled a week later, Petitioner presented Dr. Susan Cave as an expert in child psychology.  11/06/2019 CD 1 at 0:50 et seq.  Cave discussed how children have a very different conception of time, how children are easily coached, and that children need to be questioned very carefully.  Cave opined that the safehouse interviewer utilized poor interviewing techniques.

Finally, trial counsel Donald Kochersberger testified.  11/06/2019 CDs 2 and 3.  He

discussed many of the decisions he made at trial and that his theory of the case was mistaken

identity.  He hired an investigator, interviewed witnesses, obtained Petitioner's employment

records, and hired a psychologist and polygrapher in preparation for trial.  He also confirmed that

he sought the children's medical and school records.  He noted there were problems in

Petitioner's alibi defense, and recalled that he and Petitioner agreed not to present evidence that

Petitioner was seeing another woman at the time, for fear that evidence of a prior domestic

violence charge could then be presented to the jury.  Additionally, he stated that he was worried

that Petitioner's incomplete employment records at the bonding company could bolster the

children's testimony to show that they were actually accusing the correct individual.  He stated

that he considered moving for a continuance of trial when it became apparent that Ms. Trebizo

would not appear, but after speaking to his client it was decided to not make such motion.  He

explained that he chose not to present expert testimony on suggestibility or false memories since

he felt that the recorded safehouse interviews adequately demonstrated those issues.  He also

explained that he became convinced that it was better to not introduce the victim's safehouse

interviews, as he felt that he could not cherry-pick certain favorable sections of the interviews

without the entire interview being admitted into evidence.  He acknowledged that certain aspects

of the safehouse interviews were helpful, i.e. discrepancies in the victims' stories, the

identification of the suspect's tattoos, R.S. stating that she had not met "Randy", but decided he

could introduce those matters through cross-examination.  He arranged to have his client view

the safehouse interviews.  Mr. Kochersberger testified that he believed Petitioner received a fair

trial.

The state district court considered the evidence and issued an order denying habeas relief. Doc. 12-3 at 768.  The state district judge assessed Petitioner's claims of ineffective assistance and concluded that counsel's performance was not deficient, based on the presumption that counsel's conduct "falls within the wide range of reasonable professional assistance."  Doc. 12-3 at 777-78 (citing *State v. Garcia*, 2011-NMSC-003, ⁋ 33, 149 N.M. 185 (internal citation omitted)).  The state court also found that, after reviewing the record and conducting an evidentiary hearing, a presumption of prejudice does not apply.  *See* Doc. 12-3 at 778-79 (citations omitted).  The state court then evaluated Petitioner's claims under the *Strickland* deficient performance and prejudice analysis, to conclude that the issues raised do not demonstrate that Petitioner suffered prejudice.  Doc. 12-3 at 780-88.  The state judge concluded:

> Petitioner's arguments are ultimately directed at his trial counsel's defense strategy and how the case was presented to the jury.  As noted above, these complaints deal with strategy and trial tactics which this Court is not inclined to second-guess.  Taking into account the facts known to trial counsel at the time, and trial counsel's stated reasons for the actions taken, the Court cannot conclude that counsel's strategy decisions were unreasonable.  While Mr. Porter testified to a myriad of motions that could have been filed and different avenues of investigation that could have been pursued, trial counsel testified that he filed those motions he believed were appropriate and followed a strategic defense he thought had the most chance for success.  Petitioner's claims for ineffective assistance of counsel fail.

Doc. 12-3 at 787-88 (internal citations omitted).

In its review, this Court must afford the underlying state decision great deference.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (discussing "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt")); 28 U.S.C. § 2254(d). The question under consideration is whether denial of habeas relief by the state district court was objectively unreasonable.  *Cf. Williams v. Taylor*, 529 U.S. 362, 409 (2000) (court must ask

'whether the state court's application of clearly established federal law was objectively unreasonable.").

Trial counsel presented a reasonable theory of the case which focused the jury's attention on the claim that the victims were mistaken in their identification of Petitioner as the person who abused them.  The record demonstrates that trial counsel considered how evidence might further this theory, and opted to forego seeking to introduce certain evidence that might be counter-productive to the defense.  Accordingly, trial counsel opted to not seek admission into evidence of the safehouse interviews, but chose to cross-examine the girls and confront them with the inaccuracies of their prior statements.  Similarly, counsel chose to forego introducing certain records—whether work, school medical, and possibly CYFD—given that they might undermine his client's claim that he could not have had contact with the children, given that many of these records were incomplete.  Trial counsel also decided to not seek a continuance of the trial in order to secure the in-person testimony of the girls' mother, fearing that her live testimony may be less favorable (if not outright damaging) to his client's theory of the case than her recorded statement, which counsel successfully introduced into evidence.  Finally, Petitioner notes that trial counsel failed to investigate an individual who had tattoos similar to those identified by R.S., Doc. 1 at 107; Doc. 21 at 23-24, but Mr. Kochersberger disputed that he was aware of this individual prior to trial.  *See* Doc. 13-2 at 8-9.

Overall, trial counsel's decisions appear to have been made with careful consideration given to the defense theory of the case, and while there often may not be a single "correct" decision, none of these decisions by counsel can be said to be unreasonable.  As noted above, for counsel's performance to fall outside the bounds of professional reasonableness, Petitioner must show that "that counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687.  And to show prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Effective assistance can come in various forms, depending on the individual lawyer and the facts of the case.  The strategic decisions made by trial counsel here fall squarely within the attorney's decision-making process, and this Court is unable to conclude that trial counsel ever stopped functioning as counsel, or that the result of trial would have been different had counsel decided these matters differently.  Like the state district court, this Court is not inclined to second guess counsel's decisions.  *Id.* at 689-90 ("[t]here are countless ways to provide effective assistance in any given case… [and e]ven the best criminal defense attorneys would not defend a particular client in the same way…").  Counsel adequately explained his decisions before and at trial, and the state habeas judge found them reasonable and strategic in nature.  Doc. 12-3 at 787-88 ("Taking into account the facts known to trial counsel at the time, and trial counsel's stated reasons for the actions taken, the Court cannot conclude that counsel's strategy decisions were unreasonable.").  This Court is not in a position to second-guess state court conclusions that are reasoned and supported by the record evidence.  28 U.S.C. § 2254(d); *see also Hooks v. Workman,* 689 F.3d 1148, 1162–63 (10th Cir. 2012) ("This highly deferential standard for evaluating state-court rulings demands state-court decisions be given the benefit of the doubt." (quotations omitted)).  Accordingly, the Court recommends that the District Judge deny Petitioner's claims based on ineffective assistance of counsel.

4. <u>The Court Recommends Against Issuing a Certificate of Appealability</u>

29

Under Rule 11 of the Rules Governing Section 2254 Cases, the Court must issue or deny a Certificate of Appealability (COA) whenever it enters a final order adverse to the § 2254 petitioner.  *See* Habeas Corpus Rule 11(a).  A COA may issue only upon "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (stating that to obtain a COA, a petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong").  The Court concludes that Petitioner has not made such a showing and therefore recommends against the issuance of a COA.

## CONCLUSION AND RECOMMENDATION

A review of the record in this case does not show that the adjudication of Petitioner's case resulted in a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or resulted in a decision that was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In denying relief, the State district judge reasonably applied clearly established law to the evidence in Petitioner's case, and this Court is not in a position to find otherwise.  Accordingly, the Court concludes that, under the deferential standard set forth in the AEDPA, the petition for a writ of habeas corpus should be denied.

For all of the foregoing reasons, the Court finds that Petitioner Randy Salgado's *Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus By a Person In State Custody* is not well-taken and recommends that it be **DENIED** and **DISMISSED WITH PREJUDICE.**  The Court further recommends that a certificate of appealability (COA) be **DENIED**.

JOHN F. ROBBENHAAR
United States Magistrate Judge

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**